***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** EVIDENTIARY MATTER
Defendants' objection regarding plaintiff's continued examination of Dr. Plant during his deposition is OVERRULED. (Plant Depo. P. 105).
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement which was admitted into the record at the hearing before the Deputy Commissioner as Stipulated Exhibit (1), as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times herein.
3. Hartford Insurance Company was the carrier on the risk at all relevant dates herein.
4. All parties were properly before the Industrial Commission, which had jurisdiction over the parties and the subject matter of this claim.
5. Plaintiff's average weekly wage on the relevant dates herein was $458.40.
6. Plaintiff has not worked for defendant-employer since 14 June 2000.
7. All short term disability benefits and long term disability benefits were fully funded by defendant-employer.
8. At the hearing before the Deputy Commissioner, the parties agreed to stipulate to the following: any and all medical records; Industrial Commission forms 18, 19, 33, 33R and 61; plaintiff's personnel-employment file; and plaintiff's job description.
9. At, and subsequent to the hearing before the Deputy Commissioner, the parties submitted the following exhibits:
 a. A notebook of employment related and other records, which was admitted into the record and marked as Stipulated Exhibit (2);
 b. Plaintiff's medical records for the period prior to 1 July 1999, which were admitted into the record and marked collectively as Stipulated Exhibit (3);
 c. E-mail correspondences, which were admitted into the record and marked collectively as Stipulated Exhibit (4);
 d. A Short Term Disability Application form, which was admitted into the record and marked as Stipulated Exhibit (5), and;
 e. A Short Term Disability payment history from First Horizon Home Loan Corporation and a letter from UNUM Provident regarding Long Term Disability benefits received by plaintiff, which are admitted into the record and marked collectively Stipulated Exhibit (6).
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff's date of birth is 31 March 1958. Plaintiff graduated from high school and has no other formal education or technical training.
2. On 10 July 1995, plaintiff began her employment with defendant-employer as a loan processor, a job also referred to as a loan closer. In that position, plaintiff's duties included processing loan applications and compiling loan closing packages. Compiling loan closing packages involved obtaining and entering information on documents that were then submitted for approval. If the loan was approved, plaintiff contacted the borrower to obtain additional information and began preparing the closing documents. Plaintiff's duties in preparing closing documents consisted of coordinating a closing date with the closing attorney selected by the borrower, sending closing instructions to that attorney's office and obtaining insurance quotes. Several days before a closing, plaintiff would print the final version of the closing package and send it to the closing attorney.
3. Plaintiff's work with defendant-employer also involved answering phones and routing calls to the proper individuals. That duty, along with aspects of her loan closing duties, required plaintiff to communicate with others on a frequent basis.
4. Plaintiff's ordinary duties for defendant-employer were at times challenging. Plaintiff interacted with numerous people in the course of her work who were often anxious or demanding given the nature of the transaction. Also, plaintiff's work required accuracy and was time sensitive.
5. Plaintiff worked at defendant-employer's Kitty Hawk office, the dimensions of which measured approximately 47 by 20 feet. The dimensions of the office are represented in a document which is part of Stipulated Exhibit (2). Throughout the period of plaintiff's employment with defendant-employer, there were generally three to four other employees working in the office. The size of the office is such that the employees could generally see and hear what was going on in other areas of the office.
6. Defendant-employer's office manager throughout the period of plaintiff's employment was Ms. Delphine Amhrein. As part of her job, Ms. Amhrein performed the duties of a loan officer or originator, which involved brokering loans on behalf of defendant-employer. Mr. Leif Rasmussen also worked in the Kitty Hawk office as a loan officer.
7. Plaintiff's performance evaluations from October 1996 through October 1998, which were submitted as part of Stipulated Exhibit (2), indicate that her performance during this period was considered to be good, excellent or exceptional. In addition to plaintiff's positive performance evaluations, Ms. Amhrein regularly recommended that plaintiff receive the maximum available salary increases during this period.
8. At the outset of her employment with defendant-employer, plaintiff worked for both Ms. Amhrein and Mr. Rasmussen. During the first part of 1999, plaintiff began working primarily for Mr. Rasmussen, with Ms. Amhrein being assisted by other loan processors. Mr. Rasmussen had a passive management style, and allowed plaintiff to work without much oversight, feedback or direct supervision of the details of her work. During the period of her employment that she worked with Mr. Rasmussen, plaintiff was able to handle the ordinary stress associated with her job without difficulty.
9. Stipulated medical records reflect that plaintiff has an approximately nine year history of headache problems and that her headaches were often severe, requiring prescription medications. At the hearing before the Deputy Commissioner, Mr. Rasmussen testified that plaintiff's reports of headaches began to increase in the Fall of 1998. Mr. Rasmussen further testified that in February 1999, plaintiff began slurring her speech and acting differently at work. At times, plaintiff's speech and manner disturbed Mr. Rasmussen to the point where he offered her rides home so that she would not have to drive. Based on his personal observations, Mr. Rasmussen believed that plaintiff's speech and behavior problems may have been associated with the increase in medications she was taking for her migraines.
10. During the period in which plaintiff's behavior began to change, Mr. Rasmussen also observed that plaintiff used profanity on a more frequent basis and at inappropriate times. On one such occasion, plaintiff used inappropriate language within hearing distance of a customer who was in Mr. Rasmussen's office. Plaintiff's behavior had also become periodically more aggressive, as shown by one incident in which she asked a co-worker to "step outside," implying that a physical altercation was imminent.
11. Following a period of several months in which plaintiff's speech and behavioral problems continued, Mr. Rasmussen was of the opinion that plaintiff's physical condition had deteriorated to the point where it was adversely affecting her work. Mr. Rasmussen then advised Ms. Amhrein that he could no longer continue working with plaintiff. Shortly thereafter, plaintiff was scheduled to take a previously arranged vacation, so Ms. Amhrein determined that the best course of action was to allow plaintiff to take her vacation, with the hope that she would return in better condition and not exhibit similar problems.
12. Plaintiff took a two week vacation in June 1999, returning on 28 June 1999. Following her vacation, plaintiff began developing chills, back pain, soreness in her joints, shortness of breath and a sore throat. Plaintiff also reported having troubles with her voice. Due to these symptoms, plaintiff was unable to return to work following her vacation. On 30 June 1999, plaintiff reported to the emergency room and was discharged with a diagnosis of pneumonia. On 1 July 1999, plaintiff was examined by Dr. Ronald Atwood, her family physician, with complaints of pneumonia like symptoms. Following this examination, plaintiff was prescribed antibiotics and Tylenol 4.
13. On 6 July 1999, plaintiff returned to Dr. Atwood with continued pain in her chest and back, a dry cough and shortness of breath. Based upon these symptoms, Dr. Atwood suspected that plaintiff may have pluresy and chostocondritis, and further tests were conducted. On 13 July 1999, plaintiff had a chest x-ray, the results of which were normal. Tests were also performed regarding possible Lyme disease, the results of which showed evidence of a past Lyme disease, but no acute infection. In August 1999, plaintiff continued to experience shortness of breath and voice loss and she underwent a pulmonary function test which revealed severe reduction of the forced vital capacity and suggested restrictive impairment. At that time, Dr. Atwood attributed plaintiff's voice related symptoms to her cough and irritated throat.
14. Including the ten days she did not work while on her vacation, plaintiff was out of work for nearly two months in the summer of 1999 before returning in the middle of August. While plaintiff was out of work, Ms. Heidi Sawyer was assigned to perform plaintiff's duties. It is plaintiff's perception that Ms. Amhrein particularly disliked it when employees were unable to work their regular schedule, for whatever reason. Plaintiff testified that in April or May 1999, she was training a new clerical employee, Ms. Pamela Griffith, who was pregnant and scheduled to take maternity leave soon thereafter. Plaintiff testified that Ms. Amhrein instructed her not to teach Ms. Griffin how to use a certain computer program. Plaintiff perceived that Ms. Amhrein was creating an excuse to fire Ms. Griffin when she returned from maternity leave.
15. Because of the extended amount of time she had missed from work, plaintiff perceived that Ms. Amhrein attempted to make her resign after she returned to work in August 1999. Following her return to work, plaintiff testified that she began to feel harassed by Ms. Amhrein. Plaintiff further testified that everyone in the office knew that Ms. Amhrein harassed her.
16. As one example of what plaintiff perceived as harassment, plaintiff testified that upon her return to work Ms. Amhrein informed her that she was going to be promoted to a loan officer position. Plaintiff further testified that within days of being informed of the promotion, Ms. Amhrein changed the duties of the position, and limited the territory so that plaintiff would not originate loans in Dare or Currituck Counties. These counties constituted the majority of defendant-employer's profitable territories at that time. Following these changes, plaintiff testified that on 27 August 1999, Ms. Amhrein gave her a note which represented that because plaintiff was uncomfortable with the job description, that she was immediately being reinstated to her former job. Plaintiff testified that, contrary to the note, she had not informed Ms. Amhrein that she was uncomfortable with the job description of the loan officer position.
17. When the loan officer position was revoked, plaintiff was not returned to her prior job as a loan processor for Mr. Rasmussen. Instead, plaintiff was informed that she would be working directly for Ms. Amhrein, and would be assisting Ms. Sawyer in doing so. Prior to this assignment, plaintiff and Ms. Sawyer held equivalent positions and, therefore, plaintiff perceived this change as a demotion and as further evidence of what she perceived as harassment. At that time, plaintiff was not aware of Mr. Rasmussen's opinions regarding her work or of his request not to work with her.
18. In addition to the circumstances related to the potential loan officer position, plaintiff also perceived that Ms. Amhrein harassed her by excessively criticizing the details of her work, giving her angry looks, and by communicating with plaintiff in a hostile manner. Plaintiff testified that at times, Ms. Amhrein would shout at her over the office partitions while plaintiff was on the phone conducting business. Additionally, plaintiff perceived that Ms. Amhrein would often criticize her work in the presence of co-workers, and in an intimidating tone.
19. Of particular problem to plaintiff were office e-mails sent by Ms. Amhrein. On this issue, plaintiff testified that she perceived receiving 10 to15 e-mails per day from Ms. Amhrein as being excessive and as evidence of harassment. Also, plaintiff perceived the tone and content of e-mails sent by Ms. Amhrein to be harassing.
20. This pattern of harassment, as plaintiff perceived it, continued and eventually, Ms. Amhrein informed plaintiff that their future communications would be by e-mail only, with no oral communication. Plaintiff testified that this manner of communications caused her to experience additional stress. As an example, plaintiff testified that on one occasion she came to Ms. Amhrein to orally explain that she needed time off to care for her son, who had broken his ankle and required surgery. Plaintiff further testified that while relating this information, Ms. Amhrein stopped plaintiff, and instructed her to send the information in an e-mail. Regarding the e-mails generally, plaintiff testified that she began to feel a sense of dread when she overheard Ms. Amhrein typing on her keyboard, fearing that an e-mail was imminent.
21. Mr. Rasmussen and Ms. Heidi Sawyer testified regarding their perceptions of plaintiff's work environment, and her specific allegations of harassment. Additionally, Ms. Brenda Blair and Ms. Debbie McLearan were tendered as witnesses whose testimony would support the entire testimony of Mr. Rasmussen and Ms. Sawyer. Due to time constraints, at the hearing, parties agreed to stipulate that the tendered testimony of Ms. Blair and Ms. McLearan would corroborate entirely the testimony of Mr. Rasmussen and Ms. Sawyer.
22. Both Mr. Rasmussen and Ms. Heidi Sawyer testified that they did not witness any harassment of plaintiff by Ms. Amhrein and refuted plaintiff's allegations. Mr. Rasmussen and Ms. Heidi Sawyer further testified that Ms. Amhrein was professional in her dealings with plaintiff, and that no verbal harassment, angry looks or intimidation regarding plaintiff had been witnessed. Furthermore, neither Mr. Rasmussen nor Ms. Heidi Sawyer considered receiving 10 to 15 e-mails per day from Ms. Amhrein as abnormal or excessive. Mr. Rasmussen's and Ms. Sawyer's testimony in this regard is accepted as credible. Pursuant to the parties' stipulation regarding Ms. Blair and Ms. McLearan, the Full Commission finds that the testimony of these co-employees would have corroborated entirely the testimony offered by Mr. Rasmussen and Ms. Sawyer.
23. The credible evidence of record supports a finding that Ms. Amhrein's management style differed from that of Mr. Rasmussen. Whereas Mr. Rasmussen was passive in his management style, Ms. Amhrein was active in her management style and was detailed oriented. Additionally, Ms. Amhrein spoke in the office in a loud and direct manner, and would occasionally shout at employees.
24. Ms. Amhrein testified that she never engaged in any harassing conduct or acts. Ms. Amhrein further testified that her employment decisions were based upon her judgment as to what was best for plaintiff and the business. Ms. Amhrein also testified that plaintiff continued to demonstrate some of the same problems previously observed by Mr. Rasmussen, and as a result, Ms. Amhrein changed some of plaintiff's job responsibilities to accommodate plaintiff's deteriorating physical health. Ms. Amhrein's testimony in this regard is accepted as credible by the Full Commission.
25. On 11 October 1999, plaintiff informed Dr. Atwood that she was under a great deal of stress at work and that she was beginning to experience worsening migraine headaches. By 7 December 1999, plaintiff complained to Dr. Atwood that she was under daily stress at work, and that she was crying often.
26. Regarding problems with her voice, plaintiff contends that the problems which are the basis of her claim also began in October 1999 and were different from those that she experienced with her illness in July and August 1999. With the voice problems she experienced in July and August, plaintiff testified that her symptoms improved after taking antibiotics and eventually returned to normal. In contrast, defendants contend that the voice symptoms plaintiff experienced in October 1999 were the same as she displayed in the summer of 1999 upon her return from her vacation. Defendants also contend that these symptoms never completely resolved prior to October 1999. Although there is a dispute as to exactly when plaintiff's voice problems which are the subject of this claim began, the credible medical evidence of record supports a finding that the initial correlation of complaints of workplace stress and voice problems was in October 1999. By December 1999, plaintiff had completely lost the ability to speak.
27. On 29 December 1999, plaintiff returned to Dr. Atwood with complaints of no voice. Dr. Atwood's diagnosis at that time was dysphonia, which is difficulty with making sounds or speaking, and dysphagia, which is difficulty with swallowing. Due to these symptoms, Dr. Atwood opined that plaintiff was unable to return to work from 20 December 1999 through 6 February 2000. During this period of time, plaintiff received short term disability benefits from a plan funded entirely by defendant-employer.
28. Plaintiff was released to return to work on 6 February 2000, and she reported to defendant-employer's office to deliver a work release note to Ms. Amhrein. Upon receipt of the note, plaintiff testified that Ms. Amhrein expressed displeasure about not receiving more notice of her return, and noted that she was going to have to find a place from which plaintiff could work. Plaintiff further testified that she observed that her desk had been cleaned out and that her former work space had been assigned to a new loan officer, Ms. Pat Sawyer.
29. Subsequent to her return to work on 7 February 2000, plaintiff could only use her old desk when Ms. Pat Sawyer was not present. This caused plaintiff to modify the manner in which she performed her work. Plaintiff perceived the work space and desk issues as further evidence of harassment. Plaintiff also perceived as harassment the fact that she was again instructed to communicate with Ms. Amhrein only through e-mail and was not permitted to talk on the phone.
30. Following her return to work, there was a resumption of the issue of e-mails sent in the office. On or about 15 February 2000, plaintiff and Ms. Amhrein exchanged a series of e-mails regarding plaintiff's request to take time off for her son's surgery. As an example of an e-mail plaintiff perceived as being particularly harassing, she referred to the e-mail located in tab number (5) of Stipulated Exhibit (2), which is dated 15 February 2000, and was sent at 1:24 p.m. This e-mail from Ms. Amhrein indicates her displeasure or disappointment with the fact that plaintiff would be taking time off so soon after returning to work, and informed plaintiff that she would be supervised by Ms. Heidi Sawyer in the future. Ms. Amhrein's e-mails on or about 15 February 2000 also indicate her belief that plaintiff's absences from work had resulted in hardships being placed upon her coworkers and that, as a consequence, flex-time might be taken away. Plaintiff perceived the e-mails in question as further evidence of harassment.
31. Along with the work space and e-mail issues following her return to work, plaintiff also perceived a renewed pattern of harassing treatment by Ms. Amhrein through their interactions and through what plaintiff perceived as Ms. Amhrein's excessively detailed criticism of her work. By the end of February 2000, plaintiff was again beginning to experience intermittent voice loss.
32. On 16 March 2000, Ms. Amhrein gave plaintiff a modified job description and notified plaintiff that her work performance was being reviewed, and that she faced the possibility of being terminated. Following this incident, plaintiff's voice loss became more severe and occurred more frequently. By May 2000, plaintiff had completely lost her voice. Due to her condition and her perception of harassment in the workplace, plaintiff resigned from her position with defendant-employer on 15 June 2000.
33. In March 2000, plaintiff was examined by Dr. Randall Plant, an otolaryngologist, through a referral by Dr. Atwood. Dr. Plant diagnosed plaintiff as having a laryngeal muscle tension disorder, and began speech therapy. Laryngeal muscle tension disorder is a condition in which the patient contracts the muscles of the larynx and vocal folds inappropriately when trying to speak. Dr. Plant further determined that plaintiff did not have spasmodic dysphonia, which is a neurological disorder in which the vocal muscles contract too tightly, and that plaintiff's voice symptoms were different from what she had experienced in July and August 2000.
34. In Dr. Plant's opinion, the likely cause of plaintiff's laryngeal muscle tension disorder was stress. Dr. Plant has opined, to a reasonable degree of medical certainty, that the stress which caused plaintiff's laryngeal muscle tension disorder was related to her employment with defendant-employer. Additionally, Dr. Plant has opined that plaintiff's employment related stress made it more likely that she would develop her laryngeal muscle tension disorder as opposed to persons in other occupations.
35. Dr. Atwood, plaintiff's initial treating physician, has also opined that plaintiff's laryngeal muscle tension disorder was caused by her employment related stress.
36. Because her speech therapy did not improve her condition, plaintiff was referred to Dr. Errol Liebowitz, a clinical psychologist in Norfolk, Virginia, to address the underlying stress that caused her laryngeal muscle tension disorder. Dr. Liebowitz's initial examination of plaintiff was on 27 September 2000. During the period of his treatment of plaintiff, Dr. Liebowitz identified no other stressors in plaintiff's life aside from her employment related stress. Dr. Liebowitz diagnosed plaintiff as having a somatization disorder, which is also referred to as a conversion disorder. With this type of disorder, a person has a psychological problem that is manifested through physical symptoms. In the opinion of Dr. Leibowitz, plaintiff may have been predisposed to developing her conversion disorder. Dr. Leibowitz opined that plaintiff's psychological problem was work related stress. Dr. Liebowitz further opined that plaintiff's laryngeal muscle tension disorder was the physical manifestation of, and was caused by the work related stress she experienced.
37. The medical evidence of record supports plaintiff's claim that she suffered from stress related to her work place environment. Dr. Liebowitz is of the opinion that plaintiff's conversion disorder causes her to experience difficulty in differentiating between reality and her own perceptions of her surrounding environment. Based upon the testimony and opinions of Dr. Liebowitz, the stress experienced by plaintiff as the result of her employment with defendant-employer was real to her, even though it may be based upon plaintiff's erroneous perceptions of her environment.
38. Although the testimony of Ms. Amhrein, Mr. Rasmussen and Ms. Heidi Sawyer is accepted as credible, so too is plaintiff's testimony regarding what she believed and perceived to have occurred during her employment with defendant-employer.
39. In April 2001, plaintiff moved to Florida. Despite the move, plaintiff's condition did not improve until she was evaluated at Johns Hopkins University Medical Center in July 2001. At that facility, plaintiff was tested for myasthenia gravis, which could have been the cause of her throat and voice problems. Tests results available at the time of the hearing suggested that plaintiff had myasthenia gravis. However, tests conducted since that time have established that plaintiff does not have myasthenia gravis, and confirmed the earlier diagnosis of laryngeal muscle tension disorder. Myasthenia gravis is exhibited by muscle weakness, not the type of muscle spasm or hyper-contracting as observed with plaintiff.
40. While at Johns Hopkins, plaintiff was prescribed Mestinon, a medication indicated for patients with myasthenia gravis. Although it has been determined that plaintiff does not have that disease, her voice improved with the Mestinon. Dr. Plant and Dr. Liebowitz explained that this improvement was not uncommon for patients having a psychological or stress related disorder through what has is termed a placebo type of affect.
41. Plaintiff's vocal cord tension disorder affects her daily life in a variety of ways. She has had to modify her diet in order to eat foods that are easy to swallow. Plaintiff has little energy and suffers shortness of breath frequently. Plaintiff also experiences difficulty in communicating with others and has restricted activities.
42. Although plaintiff perceived that she was being harassed by a supervisor in the workplace and suffered stress as a result, plaintiff has not proven that her job duties caused her psychological condition and resulting disability. Plaintiff's perceptions of her workplace environment and the anxiety caused by her perceptions of how others interacted with her do not establish that her job duties caused, substantially contributed to the development of or placed her at an increased risk of developing conversion disorder, laryngeal muscle tension disorder or any other psychological condition she may have.
43. Plaintiff's average weekly wage while working for defendant-employer was $458.40, which yields a compensation rate of $305.75.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage while working for defendant-employer was $458.40, which yields a compensation rate of $305.75. N.C. Gen. Stat. § 97-2(5).
2. Plaintiff has failed to prove by the greater weight of the evidence that her employment duties as a loan processor or loan officer with defendant-employer caused or significantly contributed to the development of her laryngeal muscle tension disorder or any other disabling psychological condition she may have. N.C. Gen. Stat. § 97-2(6); N.C. Gen. Stat. § 97-53(13). In order for plaintiff's condition to constitute a compensable occupational disease under the Act, it must be shown that the disease is the result of conditions which are "characteristic of and peculiar to" her particular employment and not an ordinary disease to which the general public is equally exposed outside the workplace in everyday life. See Rutledge v. Tultex Corp., 308 N.C. 85,93, 301 S.E.2d 359, 365 (1983).
3. In this case, the evidence shows that plaintiff perceived that she was working for an abusive supervisor but the evidence of record does not support her perceptions. Plaintiff's perceptions of her work place environment do not satisfy her burden to prove that her disabling psychological condition was due to causes and conditions "characteristic of and peculiar to" her particular employment and was not an ordinary disease to which the general public is equally exposed outside the workplace. As such, plaintiff has not proven that she suffers from a compensable occupational disease and is not entitled to receive compensation under the Act. Woody v. Thomasville Upholstery Inc.,355 N.C. 483, 562 S.E.2d 422 (2002).
 ***********
Based upon the foregoing findings of facts and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits under the Act must be and is hereby denied.
2. The parties shall each pay their own costs.
This the ___ day of February, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ THOMAS J. BOLCH COMMISSIONER